IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WIDESPREAD ELECTRICAL SALES LLC | § § § | |
| Plaintiff, | § § | |
| V. | § § | No. 3:20-cv-2541-K |
| UPSTATE BREAKER WHOLESALE SUPPLY INC | § § § | |
| Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Widespread Electrical Sales LLC ("Widespread") filed a Motion to Exclude the Expert Testimony of Ralph Oman, *see* Dkt. No. 81 (the "Oman Motion"), whom Defendant Upstate Breaker Wholesale Supply Inc ("Upstate Breaker") has designated as an expert witness.

Upstate Breaker filed a Motion to Disqualify Plaintiff's Designated Retained Experts, *see* Dkt. No. 87 (the "Experts Motion"), seeking to disqualify Peter Kent and Rodney Sowards, whom Widespread has retained as experts.

---

[1] Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

For the reasons explained below, the Court grants Widespread's Motion to Exclude the Expert Testimony of Ralph Oman as to Oman's opinions applied to Widespread's copyright but denies it as to Oman's opinions on the history and development of the group registration copyright. And the Court grants Upstate Breaker's Motion to Disqualify Plaintiff's Designated Retained Experts as to Kent's conclusion 1 but denies to it as to Kent's other four conclusions and as to Sowards's testimony.

## I.     The Oman Argument

In the Oman Motion, Widespread asserts that "[t]he court should exclude" Oman's testimony because he "offers improper legal conclusions that are irrelevant to the trier of fact and impose on the rule of the court," and his "testimony is unsupported by evidence and is based solely on his own *ipse dixit*, rendering it unreliable." Dkt. No. 81 at 1.

As to relevance, Widespread argues:

> Mr. Oman's Report, replete with citations to case law, federal regulations, and Copyright Office practices, offers exactly the types of opinions regarding the applicability of copyright law that constitute irrelevant legal conclusions. For example, Mr. Oman concludes that the "product descriptions contained within [Widespread's website] do not exhibit any original authorship." (App. 14). He opines "that the updates to Widespread's database [] do not exhibit creativity." (*Id.*). And he states that "there is no copyright protection for 'sweat of the brow' authorship in databases." (App. 13). Mr. Oman reiterated these same legal conclusions in his deposition on August 26, 2022. (App. 255 at 21:4-19; App. 256–57 at 25:20 − 26:15; App. 256–59 at 26:24 − 28:25; App. 261–63 at 32:21 − 34:5). In fact, Mr. Oman admitted that his opinions were based on his understanding of case law as "part of the law, part of the office regulations, part of the Compendium." (App. 259 at 28:16-25).

These opinions offer legal determinations that are to be made by the Court as a matter of law and not are relevant to the trier of fact.

Mr. Oman's attempt to offer similar legal conclusions have been rejected by courts across the country. In a group registration copyright case, a federal court in Minnesota excluded Mr. Oman, explaining that the court "[could not] imagine a more clear-cut example of impermissible expert testimony on legal matters than both of Oman's expert reports." *Furnituredealer.net, Inc*, 2022 WL 891462 at *10. Another federal court excluded Mr. Oman's testimony "regarding the decision of the Copyright Office in [that] particular case or the ultimate copyrightability of the specific light fixtures at issue." *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, No. C 07-03983 JSW, 2009 WL 1764652, at *2 (N.D. Cal. June 18, 2009). Similarly, the U.S. District Court for the Western District of Missouri excluded Mr. Oman's testimony as "tantamount to instructing the jury on the law." *Osment Models, Inc. v. Mike's Train House, Inc.*, No. 2:09-CV-04189-NKL, 2010 WL 4721228, at *2 (W.D. Mo Nov. 15, 2010).

*Id.* at 5-6.

As to reliability, Widespread argues that

Mr. Oman offers little more than his credentials and his subjective opinion. He fails to consult any industry materials in forming his opinions. (App. 4–5). He opines on the creativity, authorship, and selection of Widespread's information while admitting that he has no experience in the electrical industry and has not attempted to determine creativity and selection required to describe electrical parts. (App. 260 at 31:22-25; App. 264 at 41:1-25; App. 265 at 43:1-24). And he admits that he has reviewed little more than the copyright registrations themselves and the pleadings in this case. (App. 261 at 32:1 25); App. 265 at 43:1-24).

Instead of considering substantial evidence, Mr. Oman relies on U.S. Copyright Office practice, reflected in the Office and Compendium III of Copyright Practices, the 2017 edition, and his "recollection" of the Office's practices and procedures. (App. 6, 9). He further intertwines his personal knowledge with his unsupported speculation as to the Office's motives for taking certain actions. (App. 10–12). His bare opinions alone, based on his personal knowledge and speculation, constitute impermissible "ipse dixit" testimony that should be excluded.

*Id.* at 7 (footnote omitted).

Upstate Breaker filed a response to the Oman Motion, *see* Dkt. No. 101, arguing that, "[c]ontrary to Widespread's contentions, Oman's opinions are neither improper legal conclusions nor unreliable—rather, they are based on Oman's nearly unparalleled expertise in United States' copyright law and the unique facts of this case." Dkt. No. 101 at 1. "Oman is the former Register of Copyrights of the United States and currently serves as a professor in Intellectual Property Law at George Washington University School of Law." *Id.*

Specifically, Upstate Breaker argues that Oman's opinions are relevant because they

> will be helpful for the jury to understand and decide the nature and scope of Widespread's copyright registrations to the published updates to its database in 2015, 2016 and 2017, which, by logical extension, directly bears upon the elements of Widespread's claim for copyright infringement—namely, (1) ownership of a valid copyright(s) and (2) copying by Upstate Breaker of the original work protected under said copyright(s).... To prove the former, Widespread must show "proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities" in obtaining a copyright registration. *Id.* Moreover, as the only copying that matters for purposes of a copyright infringement claim is the copying of the *protectable elements*, Upstate Breaker is entitled to offer evidence concerning the extent, if any, of protectable elements covered by the subject copyright registrations.... Those are factual determinations to be made by the trier of fact and necessarily require expert testimony because they are beyond the ken of a lay juror....
>
> To that end, this Court should permit Oman to testify concerning the policies and practices of the Copyright Office, including the legislative history concerning copyright protection of a group registration for automated databases, as that testimony is relevant to the issue of the scope of protection afforded by federal copyright law for the subject copyright registrations.

*Id.* at 4 (citations omitted).

-4-

Upstate further argues that Oman's opinions are reliable because he

> appropriately bases his opinions upon his review of the material submitted by Widespread to the United States Copyright Office, including its initial application and a representative deposit of the updates to its product database [Exhibit A]. Oman likewise bases his opinions upon the material and information referenced by Widespread's designated expert, Peter Kent in his expert report [Exhibit A]. There is no question that Oman's reliance upon the certified copies of material submitted by Widespread to the United States Copyright Office is sufficiently reliable. To the extent Widespread can credibly challenge the source of Oman's opinions, any such challenge goes to the weight of his opinions, not their admissibility.

*Id.* at 5 (citations omitted).

Widespread filed a reply, *see* Dkt. No. 109, arguing that "Upstate Breaker's

[relevance] argument is merely an attempt to recharacterize Mr. Oman's improper

legal conclusions. Testimony regarding copyrightability and ownership, for example,

are questions of law for the Court." Dkt. No. 109 at 2 (citations omitted). According

to Widespread,

> Mr. Oman has not undertaken any effort to actually determine whether the information covered by Widespread's copyright registrations is, in fact, original and copyrightable. At his deposition, Mr. Oman admitted that he did not know where the information came from, but merely stated that he "can't imagine that it was something that was not known prior to its inclusion" by Widespread. (App. (Dkt. No. 82) 264). Mr. Oman seeks to provide testimony to the jury regarding whether Widespread's information is sufficiently creative and original to be copyrightable while admitting that he does not know one way or the other whether such information was creative or original at all.
> …
> Mr. Oman offers only legal conclusions and assumptions regarding the copyrightability of Widespread's information, without any analysis of the *factual* elements of that information. Instead, Mr. Oman just broadly assumes that Widespread's information is not copyrightable, and offers improper legal conclusions in support of those assumptions.

Upstate Breaker's second argument is that Mr. Oman should be permitted to testify concerning the "policies and practices of the Copyright Office." Mr. Oman tried to offer similar opinions in a recent case, *Furnituredealer.net, Inc v. Amazon.com, Inc.*, No. 18-232 (JRT/HB), 2022 WL 891462 (D. Minn. Mar. 25, 2022). There, the court held that "this testimony [was] not necessary for several reasons," including that the party proffering Mr. Oman "[could] present legislative history which sufficiently expresses Oman's opinions on the different legislative ideas and motivations surrounding group registration," and that they "[could] simply present those portions of Compendium III that express Oman's opinions on the matter." *Id.* at *9. Upstate Breaker is quite capable of providing the legislative history itself and should be required to do so—rather than allow Mr. Oman to flaunt his credentials in parroting otherwise publicly available information.

*Id.* at 2-4

Widespread then addresses the reliability argument:

Mr. Oman offers little more than his credentials and his subjective opinion. He fails to consult any industry materials in forming his opinions. (App. (Dkt. No. 82) 4–5). He opines on the creativity, authorship, and selection of Widespread's information while admitting that he has no experience in the electrical industry and has not attempted to determine creativity and selection required to describe electrical parts. (App. (Dkt. No. 82) 260 at 31:22-25; 264 at 41:1-25; 265 at 43:1-24). He also admits that he has reviewed little more than the copyright registrations themselves and the pleadings in this case. (App. (Dkt. No. 82) 261 at 32:1-25; 265 at 43:1-24).
…
Ultimately, Widespread does not take issue with the documents Mr. Oman *did* review, it takes issue with Mr. Oman's failure to consult *additional* resources and near-complete reliance on his personal knowledge.

*Id.* at 4-5.

## II.     The Kent Argument

In the Experts Motion, Upstate Breaker asks that the Court "disqualify Kent as an expert witness" because "Kent has articulated five (5) separate conclusions in

-6-

his report [Exhibit B, ¶84], which are either entirely irrelevant, not a proper subject for expert opinion or wholly unreliable." Dkt. No. 88 at 4. Upstate Breaker argues that

> Kent first concludes that "Plaintiff's massive database of products, and the fact that it was used to create Web pages that were optimized for the search engines, provided a business advantage to the company, helping the company's Web sites be found by electricians seeking the parts sold by Plaintiff." [Exhibit B, ¶ 84]. That conclusion is completely irrelevant to any of the causes of action set forth in Plaintiff's second amended complaint (Dkt. 74)….[, and] has no bearing whatsoever on whether Upstate Breaker infringed on any of Widespread's copyrights to the updates to its database, nor does it bear upon any other element of Widespread's related causes of action for violation under the CFAA, violation of the DMCA, harmful access by a computer, or breach of contract….
>
> Likewise, Kent's second conclusion indicating that "[w]hen creating its new BuyMyBreaker.com Web site, Defendant used a similar page layout and search-engine optimization techniques as used by Plaintiff on the WidespreadSales.com site that had been scraped" is wholly irrelevant to any of the causes of action in this case, including Widespread's claim of copyright infringement. First, the "layout" of Widespread's website is not entitled to copyright protection, as a matter of law…. Second, the fact that Upstate Breaker may have utilized similar SEO techniques as those utilized by Widespread is completely irrelevant to any facts at issue in this case inasmuch as SEO techniques merely relate to the process of improving the quality and quantity of traffic to a website or a web page from a search engine [Exhibit B, ¶ 30], and have no bearing upon Upstate Breaker's alleged scraping activity giving rise to any of Widespread's causes of action in this case. In fact, Kent explicitly testified that the SEO techniques supposedly used by Upstate Breaker are not unique to Widespread and are commonly used by all "companies that are optimizing." [Exhibit D, p. 57]….
>
> Kent's [fourth] conclusion that "[p]rior to launching the new BuyMyBreaker.com site, Defendant had a very simple six-page Web site (UpstateBreaker.com) with no product catalog, and recorded no revenues" [Exhibit B, ¶ 84] is likewise irrelevant to any facts at issue in this case and, moreover, is not a proper subject for expert opinion. The only website operated by Upstate Breaker that is the subject of this lawsuit is the website with the domain name www.buymybreaker.com (Dkt. 74, ¶ 23). Accordingly, Kent's "conclusion" that prior to launching

-7-

the buymybreaker.com website, Upstate Breaker operated a separate "simple" website with an entirely different domain name has nothing to do with any facts giving rise to Widespread's causes of action in this lawsuit (*see* Dkt. 74). Moreover, simply noting that Upstate Breaker operated another website prior to launching a second website with a different domain name does not require scientific, technical or other specialized knowledge and, accordingly, is not a proper subject for expert testimony....

Kent's third conclusion that "Plaintiff's site has included notifications proscribing the scraping of data from the site as early as June 2015" [Exhibit B, ¶¶ 74-77, 84] is not a proper subject for expert testimony because it is within the common sense and understanding of the trier of fact. *See id.* Indeed, paragraphs 74 through 77 of Kent's report merely outline the various places on Widespread's website where notices prohibiting scraping can be found [*see* Exhibit B, ¶¶ 74-77]. Those notices would be readily obvious and discernable to any lay juror, without requiring expert testimony. *See id.*

In his fifth bulleted conclusion paragraph, Kent opines that "Defendant clearly benefited from the use of the scraped data, as can be seen from the revenue report showing the company suddenly selling products after the launch [of the buymybreaker.com website], with revenues reaching $139,555 in the month of November 2021." [Exhibit B, ¶ 84].... Kent's opinion regarding Upstate Breaker's supposed "benefit" derived from "use of the scraped data" is completely misleading in light of his testimony conceding that he does not actually know what, if any, amount of revenue generated by Upstate Breaker is attributable to its scraping of Widespread's website [Exhibit D, pp. 52-53].... Kent's "opinion" is nothing more than a general observation that Upstate Breaker saw an increase in revenue after launching its ecommerce website, and assumes, without evidentiary support, that such an increase was causally related to Upstate Breaker's alleged infringing activity.

Furthermore, Kent's [fifth] "conclusion" concerning Upstate Breaker's purported financial benefit from its use of scraped data from Widespread's website is entirely speculative and thus, unreliable.... Kent opines in a conclusory manner that Upstate Breaker derived financial benefit as a result of scraping data from Widespread's website because its buymybreaker.com website "has more products, matching more searches" which "means the site will get more visits and thus more sales," all of which is a direct result of SEO techniques employed by Upstate Breaker to increase the site's "matching" on search engines like Google [Exhibit B, ¶¶ 78-81]. Notably, however, Kent conceded that the mere fact that Upstate Breaker has 18,200 indexed pages from Google

is not due solely to the fact that it scraped some data from Widespread's website [Exhibit D, pp. 50-51] and further admitted that ecommerce web sites like buymybreaker.com could be created from data sources other than Widespread's website [Exhibit D, pp. 51-52], and would still result in the same number of indexed web pages by Google. To that end, and significantly, Kent admitted that to his knowledge, Upstate Breaker obtained data from other sources beyond data scraped from Widespread's website [Exhibit D, p. 19], thus tacitly acknowledging that the number of indexed web pages by Google from Upstate Breaker's website is a product of Upstate Breaker's efforts in obtaining data and information from sources *other than* Widespread's website.

This is particularly significant given Kent's acknowledgment in his expert report that "[s]ome of the individual pieces of data scraped from the WidespreadSales.com Web site were **public knowledge**: **the product name and part number, for instance"** [Exhibit B, ¶ 48] (emphasis added), which completely undermines his opinion that Upstate Breaker derived financial benefit from any alleged infringing activity....

In sum, Kent's opinion that Upstate Breaker "benefitted" financially from infringing Widespread's copyrights is simply too great an analytical leap between the data and the opinion proffered and must be precluded, particularly given the absence of any analysis that Upstate Breaker's profits "are *attributable* to the infringement," as required under federal copyright law.

*Id.* at 5-11. (footnotes and citations omitted, emphasis in original)

Widespread filed a response, *see* Dkt. No. 99, arguing that

Mr. Kent's testimony concerning conclusions 1 and 4 is relevant to a factual element of Widespread's copyright claim—the benefits enjoyed by infringing on Widespread's database....

To succeed on its copyright infringement claim, Widespread must prove that Upstate Breaker benefitted from its infringement. Mr. Kent does this in part by first describing "Plaintiff's massive database of products, and the fact that it was used to create Web pages that were optimized for the search engines," and therefore "provided a business advantage to the company, helping the company's Web sites be found by electricians seeking the parts sold by Plaintiff." (App. 39). After explaining the SEO benefits Widespread enjoyed from the copyrighted information, Mr. Kent illustrates how Upstate Breaker now enjoys these SEO benefits after scraping data from Widespread's site. (App. 35–38).

This evidence of the benefits enjoyed by Upstate Breaker is directly relevant to Widespread's copyright infringement claim.

Mr. Kent also describes the differences between UpstateBreaker.com (Upstate Breaker's first website) and BuyMyBreaker.com (Upstate Breaker's newer website incorporating the scraped data) to provide further evidence of Upstate Breaker's copying and the benefits Upstate Breaker enjoys as a result. For example, Mr. Kent describes how Upstate Breaker went from a six-page website with no catalog or revenue to a website with hundreds of thousands of product pages and is often second only to Widespread's website in a Google search results. (*See* App. 35–38). By scraping Widespread's data and republishing Widespread's extensive catalog, Upstate Breaker was able to realize the search engine optimization benefits of Widespread copyrighted materials. (App. 38). Specifically, with Widespread's copyrighted information, Upstate Breaker is able to capitalize on customers searching for electrical parts on search engines, who would not have found Upstate Breaker's website if it did not contain Widespread's information. (*Id.*)….

[As to his second conclusion,] Mr. Kent offers a detailed analysis as to the similarities between the product pages on Widespread's website and Upstate Breaker's BuyMyBreaker.com, including Upstate Breaker's inclusion of the same product descriptions, specifications, and similar and associated products. (*See* App. 28–32). This side-by-side comparison is directly relevant to the actionable copying element of Widespread's infringement claim….

---

[As to his third conclusion,] ***First***, Mr. Kent goes beyond common understanding by explaining that the anti-scraping notifications were embedded in the "Web-page template" and are thus coded and embedded in nearly every page of the website. (App. 35)… Mr. Kent uses his technical expertise to explain to the jury how he understands that Widespread's anti-scraping notice was on every page at the time Upstate Breaker scraped Widespread's website. This testimony is beyond common sense experience or understanding.

***Second***, Mr. Kent's opinions regarding Widespread's prohibition on scraping its website are directly relevant to Widespread's breach of contract claim. By explaining that Widespread's Website Use Agreement is embedded in nearly every page of Widespread's website, Mr. Kent's testimony will assist the trier of fact in determining Upstate Breaker's actual or constructive knowledge of Widespread's Website Use Agreement.

[As to his fifth conclusion,] Mr. Kent provides a step-by-step analysis of how Upstate Breaker benefitted from scraping Widespread's

-10-

database, explaining both his methodology and the data points supporting it. As such, Mr. Kent's testimony is reliable.

Mr. Kent outlines the facts and data on which he relies and the principles and methodology underlying his conclusion. As a baseline, Mr. Kent considered Upstate Breaker's original six-page website with no catalog or revenue. (App. 22). Mr. Kent examined Upstate Breaker's newly-created website, BuyMyBreaker.com, with hundreds of thousands of product pages using the information Upstate Breaker scraped from Widespread's website. (App. 35–38). As Mr. Kent notes, Upstate Breaker's new website now uses the information Upstate Breaker scraped to be better optimized for search engines such as Google, meaning BuyMyBreaker.com appears higher on search engine result pages in response to customer queries. (*Id.*). Mr. Kent explains that by scraping all of Widespread's product pages and using them as their own, Upstate Breaker capitalized on the search engine optimization built into those webpages by Widespread. (App. 38). Ultimately, Mr. Kent concluded that Upstate Breaker has "more products, matching more searches, [which] means the site will get more visits and thus more sales." (App. 35). Therefore, "[t]he reason the revenues increased is because they launched a web site with a lot of product pages." (App. 81–82 at 52:9–53:5).

In tacit acknowledgement that Mr. Kent provided both the data and methodology underlying this conclusion, Upstate Breaker argues for Mr. Kent's disqualification based on the contention that the benefits Upstate Breaker received derived from "publicly available information and cannot possibly be related to any alleged copyright infringement." (Mot. at 11). Upstate Breaker's argument—related to the copyrightability of Widespread's information—fails for two reasons. *First*, as Mr. Kent made clear, he is not an expert in copyright law and is not seeking to testify as to the copyrightability of Widespread's information. (App. 79–80 at 10:25–11:9). *Second*, this argument relates to the merits of Mr. Kent's testimony. But the Court's role at this stage is determine whether Mr. Kent's testimony is pertinent and reliable, not to determine whether Upstate Breaker's theory of the case is correct.

*Id.* at 10-16 (citations omitted).

Upstate Breaker filed a reply, *see* Dkt. No. 107, asserting that,

[a]s to Kent's first conclusion… the fact that Upstate Breaker may have utilized similar SEO techniques as those utilized by Widespread has no relevance in this case because, by Kent's own admission, the SEO techniques purportedly used by Upstate Breaker are not unique to

-11-

Widespread and are commonly used by all "companies that are optimizing." [Exhibit D, p. 57]. Not surprisingly, Widespread's opposition does not even address Kent's testimony in that regard [Dkt. 99], wholly ignoring Upstate Breaker's contention that the use of "similar" SEO techniques to improve traffic to a website does not constitute infringement and, in fact, is a routine and common practice for any business selling products on the internet….

Furthermore, Kent's second "conclusion" that Upstate Breaker "used a similar page layout…as used by Plaintiff on the WidespreadSales.com site" is entirely irrelevant to any claim of infringement because website layouts are not protected under federal copyright law, a point Widespread appears to concede…. Widespread… argues Kent's opinions concerning the purported similarities between the two websites are nonetheless relevant because a "side-by-side comparison" of the two works is necessary to prove infringement. [Dkt. 99, at 12]. Significantly, however, the "side-by-side comparison" employed in copyright infringement actions is measured by the "layman" or "ordinary observer" test, and is therefore not a proper subject of expert testimony.

Moreover… his opinions [are still] subject to preclusion because they lack a proper foundation. Specifically, where, as here, the "copyrighted work contains unprotectable elements, the first step is to distinguish between protectable and unprotectable elements of the copyrighted work" before undertaking the "substantial similarity" analysis.

Here, there is no question that Widespread's copyright registrations, designated as a "compilation" covering published updates to its automated database, include unprotectable elements—namely, factual data regarding product names, part numbers and corresponding product specifications, all of which is derived from the manufacturer and which Kent concedes is publicly available information [Ex. A, pp. 16-17]. Accordingly, before even opining on "substantial similarity," the first step in the analysis requires "distinguish[ing] between protectable and unprotectable elements of the copyrighted work." *Nola Spice Designs, LLC*, 783 F.3d at 550. Kent failed to do so here and, in fact, testified he is "not a copyright expert" and has no knowledge as to what information contained on Widespread's website is actually covered by the subject copyright registrations.

Widespread contends Kent's third "conclusion" that Widespread's site includes notifications "proscribing the scraping of data from the site" is the proper subject of expert testimony because said opinion goes beyond "common understanding…." [T]here is no mention in Kent's report that these anti-scraping notifications were either "embedded" or

"coded" in Widespread's website [Exhibit A, ¶¶ 74-77], but even assuming that were true, it is a distinction without a difference. Whether the anti-scraping notifications were "coded" or "embedded" in Widespread's website does not change the fact that their presence on said website would be readily obvious and discernable to any lay juror, without requiring expert testimony.

[As to] Kent's fifth "conclusion," Kent employs no methodology whatsoever to support his opinion that Upstate Breaker supposedly "benefited" from the use of scraped data from Widespread's website. Rather, Kent's "opinion" is merely based on his observation that after Upstate Breaker launched its website and began selling products online, those online sales generated revenue [Exhibit C, pp. 52-53]. But, as Kent readily concedes, scraping does not constitute copyright infringement [Exhibit 1, pp. 16-17] and, moreover, any opinion concerning Upstate Breaker's alleged financial benefit attributable to scraping activity that infringed upon Widespread's copyright is entirely speculative in light of Kent's concessions that: (1) he does not even know what information is covered by the subject copyrights; (2) individual pieces of the scraped data were within the public domain and, thus, not subject to copyright; (3) e-commerce sites like buymybreaker.com could be created from data sources other than Widespread's website and would still result in the same number of indexed searches by search engines, such as Google, and (4) Upstate Breaker obtained data from sources beyond data scraped from Widespread's website, indicating the number of indexed web pages by Google from Upstate Breaker's website is a product of Upstate Breaker's efforts in obtaining information from sources *other than* Widespread's website [Exhibit A, ¶¶ 48, 78-81; Exhibit C, pp. 19-20, 51-52].

*Id.* at 2-7 (citations omitted)

## III. The Sowards Argument

In the Experts Motion, Upstate Breaker also seeks to disqualify Sowards's testimony, which is "limited solely to Widespread's claimed damages under federal copyright law for Upstate Breaker's alleged infringement." Dkt. No. 88 at 12. Upstate Breaker argues that

Sowards' report provides no analysis whatsoever establishing the requisite "causal link" between the alleged infringement and Upstate

Breaker's gross revenue from August 2019 through December 2021 [Exhibit C]. Instead, Sowards simply states that Upstate Breaker's gross revenue is the "applicable revenue subject to an Accounting of Profits under Statute 17 USC 504" and, without any explanation at all, makes the giant—and unsubstantiated—leap concluding that Widespread suffered damages in the amount of $1,477,286.00 [Exhibit C]. Given the complete lack of any analysis to support his conclusion that the amount of Upstate Breaker's gross revenue from August 2019 through December 2021 is attributable to the alleged infringement, Sowards' opinion is completely speculative and falls woefully short of meeting the reliability standard articulated under *Daubert* and Rule 702.

*Id.* at 13.

In its response, *see* Dkt. No. 99, Widespread argues that

Mr. Sowards offers expert testimony "as to the amount of monetary damages Widespread suffered as a result of Defendant's alleged copyright use, misappropriation of Plaintiff's copyrights, and Plaintiff's other claims."6 (App. 60). As Mr. Sowards explained in his Report, Widespread has alleged (and it is undisputed) that Upstate Breaker scraped over 600,000 product pages from Widespread's website and republished that information on BuyMyBreaker.com, comprising essentially all of the product pages on BuyMyBreaker.com. (App. 61). Because Upstate Breaker's BuyMyBreaker.com "was populated with the alleged copyright information of Plaintiff," Mr. Sowards determined that the gross revenue generated through BuyMyBreaker.com constitutes "the applicable revenue subject to an Accounting of Profits under Statute 17 USC 504." (App. 62)....

Mr. Sowards explained that BuyMyBreaker.com was populated using the information Upstate Breaker copied from Widespread, and therefore the revenue generated from BuyMyBreaker.com constitutes profits attributable to the infringement pursuant to 17 U.S.C. § 504. (App. 62). This causal link between the information Upstate Breaker copied and the revenue generated from Upstate Breaker's website populated with the copied information is sufficient to explain Mr. Sowards' methodology....

Mr. Sowards also noted that he could consider gross revenue generated from each part number scraped by Upstate Breaker from Widespread's website, but "***Defendant has not provided [this information]***." (App. 61) (emphasis added)....

-14-

Ultimately, Upstate Breaker's argument amounts to a complaint about Mr. Sowards' conclusions, not his methodology. But, in addition to being factually incorrect, Upstate Breaker's pre-mature attacks on Mr. Sowards' conclusions fail for two reasons. ***First***, at this stage, the Court considers the expert's methodology, not the conclusions generated by that methodology. ***Second***, Upstate Breaker will have the opportunity to raise its disagreements through cross examination or the presentation of contrary evidence at trial.

*Id.* at 16-18 (citations omitted).

Upstate Breaker filed a reply, *see* Dkt. No. 107, arguing that

Sowards's report provides no analysis whatsoever, including the requisite "link" between the facts and his conclusions…. In sum, given the complete lack of any analysis to support his conclusion that the amount of Upstate Breaker's gross revenue from August 2019 through December 2021 is attributable to the alleged infringement, Sowards's opinion is completely speculative and falls woefully short of meeting the reliability standard articulated under *Daubert* and Rule 702.

*Id.* at 8.

United States District Judge Ed Kinkeade has referred the Oman Motion and the Experts Motion to the undersigned United States magistrate judge for a hearing, if necessary, and determination under 28 U.S.C. § 636(b). *See* Dkt. No. 90; *see also Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 346 n.2 (5th Cir. 2020) (the admissibility of an expert report is "a non-dispositive matter," which can be ""referred to a magistrate judge to hear and decide'" under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A)).

For the reasons and to the extent explained below, the Court grants Widespread's Motion to Exclude the Expert Testimony of Ralph Oman [Dkt. No. 81] as to Oman's opinions applied to Widespread's copyright but denies it as to Oman's

opinions on the history and development of the group registration copyright. And the Court grants Upstate Breaker's Motion to Disqualify Plaintiff's Designated Retained Experts [Dkt. No. 87] as to Kent's conclusion 1 but denies it as to Sowards's testimony and Kent's other four conclusions.

### Background and Legal Standard

The parties and the Court are familiar with the background of this case, so the Court will not repeat it here. *See generally Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*, No. 3:20-cv-2541-K, 2021 WL 2651087 (N.D. Tex. June 28, 2021).

As another judge in this district recently laid out,

> Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence. Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."

*Ramos v. Home Depot Inc.*, No. 3:20-cv-1768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022) (cleaned up).

"In its gatekeeping role, the Court determines the admissibility of expert testimony based on Rule 702 and [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993),] and its progeny." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 800 (N.D. Tex. 2018), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018). Under Rule 702 and *Daubert*,

> [a]s a gatekeeper, this Court must permit only reliable and relevant testimony from qualified witnesses to be admitted as expert testimony. The party offering the expert testimony has the burden of proof, by a preponderance of evidence, to show that the testimony is reliable and relevant.

*Ramos*, 2022 WL 615023, at *1 (cleaned up). And "*Daubert'*s general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Applying this analytical framework under Rule 702 and *Daubert*, a "court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Galvez v. KLLM Transp. Servs., LLC*, 575 F. Supp. 3d 748, 759 (N.D. Tex. 2021).

"First, an expert must be qualified. Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training or education." *Aircraft Holding Sols., LLC v. Learjet, Inc.*, No. 3:18-cv-823-D, 2022 WL 3019795, at *5 (N.D. Tex. July 29, 2022) (cleaned up). "The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Holcombe*, 516 F. Supp. 3d at 679-80 (cleaned up); *accord Arnold v. Allied Van Lines, Inc.*, No. SA-21-CV-00438-XR, 2022 WL 2392875, at *18 (W.D. Tex. July 1, 2022) ("Testimony regarding first-hand,

historical perceptions constitutes lay, not expert, opinion testimony."). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Aircraft Holding*, 2022 WL 3019795, at *5 (cleaned up).

And, if the expert is qualified, "Rule 702 charges trial courts to act as gate-keepers, making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Expert testimony must be both relevant and reliable to be admissible." *Hall v. State*, No. CV H-21-1769, 2022 WL 2990912, at *4 (S.D. Tex. July 28, 2022) (cleaned up).

> Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue. Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."

*Id.* (cleaned up). "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). "To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) (cleaned up).

"When performing [the required gate-keeping Rule 702 and *Daubert*] analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). "Assisting the trier of fact means the trial judge ought to insist that a proffered expert

bring to the jury more than the lawyers can offer in argument," but "the helpfulness threshold is low: it is principally ... a matter of relevance." *Id.* at 293-94 (cleaned up).

As to reliability, the required "analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia," and "mandates that expert opinion be grounded in the methods and procedures of science." *Jacked Up*, 291 F. Supp. 3d at 801 (cleaned up). "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "Expert testimony is reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Ramos*, 2022 WL 615023, at *1 (cleaned up).

"Such testimony must be more than subjective belief or unsupported speculation." *Id.* (cleaned up). "In other words, this Court need not admit testimony that is connected to existing data only by the ipse dixit [– that is, an unproven and unsupported assertion resting only on the authority –] of the expert." *Id.* (cleaned up). "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Holcombe*, 516 F. Supp. 3d at 687 (cleaned up).

"Experts are permitted to rely on assumptions when reaching their opinions," but "those assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up*, 291 F. Supp. 3d at 807-07 (cleaned up). "But there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Id.* at 801 (cleaned up). More specifically, "[e]xperts are permitted to assume the fact of liability and opine about the extent of damages," and "[a]n expert's

reliance on assumptions does not itself make the expert opinion unreliable or inadmissible." *ENGlobal U.S. Inc. v. Native Am. Servs. Corp.*, No. CV H-16-2746, 2018 WL 1877015, at *8 (S.D. Tex. Apr. 19, 2018) (cleaned up).

And Federal Rule of Evidence 703 "permit[s] an expert witness to base his opinion on 'facts or data ... that the expert has been made aware of or personally observed' and to opine [and based his opinion] on inadmissible evidence if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'" *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 269 & n.10 (cleaned up). More specifically, courts have concluded that, although a party's damages expert "did not personally observe the facts or data in [another expert's report], as a damages expert, he may rely on hearsay, including other expert reports, in forming his opinions." *ENGlobal*, 2018 WL 1877015, at *11 (cleaned up).

Still, "Rule 702 and *Daubert* require an expert witness independently to validate or assess the basis for his or her assumptions," and "[t]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable," which "requires some objective, independent validation of the expert's methodology." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. In the words of the Third Circuit, the suggestion that the

-20-

reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 348-49 (cleaned up). "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"The Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors, [which are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community]." *Ramos*, 2022 WL 615023, at *1 & n.11 (cleaned up). "But these factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kim v. Nationwide Mut. Ins. Co.*, No. 3:21-cv-345-D, 2022 WL 2670393, at *5 (N.D. Tex. July 11, 2022) (cleaned up). "The point of this inquiry is to make certain that an expert, whether basing testimony upon professional studies or

personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Holcombe*, 516 F. Supp. 3d at 674 (cleaned up).

"The Court also does not need to admit testimony based on indisputably wrong facts." *Ramos*, 2022 WL 615023, at *1 (cleaned up). "The Fifth Circuit has recognized that [t]he *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion,'" and "an opinion based on insufficient, erroneous information, fails the reliability standard." *Jacked Up*, 291 F. Supp. 3d at 802 (cleaned up). "And although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, the existence of sufficient facts ... is in all instances mandatory." *Id.* (cleaned up).

But, "[i]n conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology." *Ramos*, 2022 WL 615023, at *1 (cleaned up). A motion to exclude is not properly based on an "objection that goes to whether [the proffered expert's] opinion is correct, not whether it is reliable," where "[t]he proponent need not prove to the judge that the expert's testimony is correct, but," rather, "by a preponderance of the evidence that the testimony is reliable." *Aircraft Holding*, 2022 WL 3019795, at *8 (cleaned up). "Even when a court rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019), as revised (Aug. 9, 2019) (cleaned up). And, so, "[w]hen

-22-

the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *ENGlobal*, 2018 WL 1877015, at *8 (cleaned up).

The Court cannot accept arguments that "urge[] the Court to establish an unattainable goalpost, essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove [the expert testimony's proponent's] theory of its case or an element of a claim or defense," and thereby "confus[e] admissibility with sufficiency, and sufficiency with certainty." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). That "is not the standard for admissibility," or "even the standard for success on the merits," and "[i]t is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact." *Id.*

"If, however, there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered, the court may exclude the testimony as unreliable." *Kim*, 2022 WL 2670393, at *5 (cleaned up). For example, "the Court may exclude [an expert witness's] analysis if the studies that he relies on are so dissimilar to the facts presented that [the expert witness's] opinions cannot be sufficiently supported by the studies." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). "But the notion that expert testimony is only admissible to the extent that it is based on studies of identical individuals under identical circumstances would not only turn the 'flexible' inquiry envisioned under Rule 702 on its head, but such rigid constructions

-23-

of reliability and relevance would defeat the very purpose of expert testimony: to help the trier of fact understand and evaluate the evidence." *Id.* at 676-77 (cleaned up).

The "evidentiary gates [provided by Rule 702 and *Daubert*] exist to keep out error that may impermissibly affect the jury" and "to protect juries from unreliable and irrelevant expert testimony." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 264, 268. But "[t]he court's inquiry is flexible in that [t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). And, "[p]articularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role – the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. Thus, [w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (cleaned up).

And "[t]he Fifth Circuit has noted that [a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," and, "[a]ccordingly, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Ramos*, 2022 WL 615023, at *3 (cleaned up). Generally, an opposing party's "doubts about the bases for [an expert's]

opinions do not render his opinions so unsupported as to create 'too great an analytical gap' between the evidence he relies on and his opinions." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up).

## Analysis

### I.     The Oman Motion

Upstate Breaker proffers the expert testimony of Oman for his expertise in copyrights as the former Register of Copyrights and a Professor of Intellectual Property Law at George Washington University Law School.  His opinions as applied to Widespread's copyright are excluded, but his opinions about the history and development of the group registration copyright are not.

"[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). But the task of separating impermissible legal testimony from permissible testimony "is not a facile one." *Id.* "[M]erely being a lawyer does not disqualify one as an expert witness. Lawyers may testify as to legal matters when those matters involve questions of fact." *Askanase v. Fatjo*, 130 F.3d 657, 672 (5th Cir. 1997). "[W]hile experts [can] give their opinions on ultimate issues, our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury." *Id.* at 673.

"Copyrightability is a question of law for the Court, but copyright infringement is a question for the trier of fact." *SAS Inst. Inc. v. World Programming Ltd.*, 496 F. Supp. 3d 1019, 1022 (E.D. Tex. 2020). "[A] claim for copyright infringement has three

elements: '(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity.'" *Batiste v. Lewis*, 976 F.3d 493 at 502 (5th Cir. 2020) (quoting *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007)). "'Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities.'" *Id.* at 501 (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)).

Courts must "'filter[ ] out' nonprotectable elements such that such that 'there remains a core of protectable expression.'" *Id.* (quoting *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004)). "If a core of protectable expression is found, '[t]ypically, the question whether two works are substantially similar,'—i.e., the infringement analysis—'should be left to the ultimate factfinder.'" *Id.* (quoting *Gen. Universal Sys., Inc.*, 379 F.3d at 142).

Upstate Breaker argues that Oman's opinions will be helpful for the jury to understand the scope of Widespread's copyright registrations. But Oman's opinions as he applies them to Widespread's copyright "cross the line into … attempting to instruct the jury on the law." *Furnituredealer.net, Inc v. Amazon.com, Inc*, No. CV 18-232 (JRT/HB), 2022 WL 891462 at *8 (D. Minn. Mar. 25, 2022) (finding Oman's testimony to be impermissible testimony on legal matters).[2]

---

[2] *C.f. Paul Morelli Design, Inc. v. Tiffany And Co.*, 200 F. Supp. 2d 482, 486 (E.D. Pa. 2002) ("To the extent Mr. Oman would have opined on the law, that was a matter for the court."); *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, No. C 07-03983 JSW, 2009 WL 1764652 at *1 (N.D. Cal. June 18, 2009) ("to the extent Mr. Oman is proffered to testify about the copyrightability of the specific light fixtures in this matter or the particular decision on those fixtures, that testimony

Oman opines that "there is no 'sweat of the brow' copyright protection for databases." Dkt. No. 82 at 15. Oman cites directly to *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991), a Supreme Court case, for this proposition. This amounts to instructing the jury on law, which is the province of the court.

Oman also asserts that "[t]here is no original authorship in selection or coordination/arrangement of the data files." Dkt. No. 82 at 16. Here, Oman speaks to "the larger issue of copyrightability of the compilation as a whole," opining that "the updates to Widespread's database likewise do not exhibit creativity in either selection, coordination, and/or arrangement" Dkt. No. 82 at 16-17. But copyrightability is a matter of law for the Court to decide. Oman again invades the province of the Court.

To the extent that it speaks directly to issues of law, as it does when applied to Widespread's copyright, the Court excludes Oman's expert testimony.

---

does indeed pertain to an ultimate issue of law to be decided by the Court, and not by the jury."); *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao LTDA.*, No. 07-21827-CIV, 2010 WL 11442639 at *2 (S.D. Fla. June 21, 2010) ("Mr. Oman—a law professor himself—has a history of overstepping the proper bounds of expert testimony and asserting inappropriate legal conclusions."); *Osment Models, Inc. v. Mike's Train House, Inc.*, No. 2:09-CV-04189-NKL, 2010 WL 4721228 (W.D. Mo. Nov. 15, 2010) at *2 (Even though copyright law is his field of expertise, to the extent that Mr. Oman's testimony discusses copyright law, the Court excludes such testimony because it is tantamount to instructing the jury on the law. That is for the Court to do.); *Mattel, Inc. v. MGA Ent., Inc.*, No. CV049049DOCRNBX, 2011 WL 13128409 (C.D. Cal. Jan. 26, 2011) at *2 ("the Court, and not Oman, must provide instruction about the legal significance about Mattel's prior representations").

But Oman's testimony has another component to it: a discussion of the history and development of the group registration copyright. Upstate Breaker argues that this testimony "is relevant to the issue of the scope of protection afforded by federal copyright law for the subject copyright registrations." Dkt. No. 81 at 9.

Courts have been more favorable to Oman's testimony about copyright policy. *See Jonathan Browning*, 2009 WL 1764652 at *1 (To the extent Mr. Oman wishes to testify generally about the practices and procedures of the U.S. Copyright … Mr. Oman is entitled to so testify.); *but see Furnituredealer.net*, No. CV 18-232 (JRT/HB), 2022 WL 891462 at *9 (finding Oman's testimony as to the history and development of the group registration relevant but unnecessary because the proponent of Oman's testimony could present the parts of the legislative history and the Compendium III of Copyright Office Practices that expressed Oman's opinions on the matter). Oman's testimony on the history and development of the group registration is particularly relevant because he was the Register of Copyrights during the development of the group registration.

Widespread argues that the Court should hold as the judge in the District of Minnesota did in *Furnituredealer.net* and deem this part of Oman's testimony unnecessary. But the Court disagrees. Oman's first-hand knowledge of the concerns of the copyright office during the development of the group registration bring to the jury more than the lawyers can offer in argument.

To the extent that it discusses the history and development of the group registration, the Court will not exclude Oman's expert testimony.

## II.    The Experts Motion

### A.    The Kent Expert Testimony

Widespread proffers the expert testimony of Kent for his expertise in e-commerce and search-engine optimization ("SEO"). Upstate Breaker asks the Court to disqualify Kent as an expert witness and exclude his opinions in their entirety, but Upstate Breaker addresses his opinions separately as five "conclusions" that he offered in his report. Conclusion 1 is excluded as irrelevant, but the other four conclusions are not excluded.

#### i.    Conclusions 2 and 4 are relevant, but conclusion 1 is not.

Kent's first conclusion states that "Plaintiff's massive database of products, and the fact that it was used to create Web pages that were optimized for the search engines, provided a business advantage to the company, helping the company's Web sites be found by electricians seeking the parts sold by Plaintiff." Dkt. No. 95 at 41.

Upstate Breaker argues that this conclusion is irrelevant to any of Widespread's causes of action. In its response, Widespread asserts that the first conclusion is relevant to its copyright infringement claim.

Widespread's claim that it needs to prove that Upstate Breaker benefitted from its infringement in order to succeed on its copyright infringement, *see* Dkt. No. 99 at 10, is incorrect. It cites to *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447 (5th Cir. 2001), for this proposition. But *Logan* is a Lanham Trade-Mark Act case dealing with a false advertising claim, not a copyright infringement case. *See id.* at 460.

-29-

"[A] claim for copyright infringement has three elements: '(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity.'" *Batiste*, 976 F.3d at 502 (quoting *Armour*, 512 F.3d at 152). Widespread has not shown that Kent's conclusion that Widespread benefitted from its product database and Web site is relevant to any of its causes of action. And, so, Kent's first conclusion is excluded from his expert testimony.

Kent's second conclusion is that "[w]hen creating its new BuyMyBreaker.com Web site, Defendant used a similar page layout and search-engine optimization techniques as used by Plaintiff on the WidespreadSales.com site that had been scraped." Dkt. No. 95 at 41. Upstate Breaker argues that its use of similar SEO techniques is irrelevant to Upstate Breaker's alleged scraping activity.  Widespread argues that this conclusion is relevant to a side-by-side analysis.

To succeed on a claim for copyright infringement, Widespread must show substantial similarity between the copyright registrations on its Web site and Upstate Breaker's Web site. *See Batiste*, 976 F.3d at 502. "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as substantially similar." *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (quotation marks omitted). "[E]xpert testimony relating to the points of similarity … would provide context" and "would be helpful to the jury." *Rally Concepts, LLC v. Republican Nat. Comm.*, No. 5:05-CV-41-DF, 2006 WL 6889674 at *2 (E.D. Tex. Nov. 9, 2006).

Expert testimony on the similarities between the two Web sites would be relevant to the side-by-side analysis that a jury must do to decide whether Upstate Breaker infringed Widespread's copyright.

To the argument that a filtration step must come before the side-by-side analysis, that may be the rule followed when discussing the merits of Widespread's case. But, at this stage, Widerspread is not required to "conclusively prove [its] theory of the case." *Holcombe*, 516 F. Supp. 3d at 675. It need only gather the evidence it needs to prove that theory of the case. And so the Court will not exclude this conclusion and the testimony relating to it.

Kent's fourth conclusion is that "[p]rior to launching the new BuyMyBreaker.com site, Defendant had a very simple six-page Web site (UpstateBreaker.com) with no product catalog, and recorded no revenues."

Upstate Breaker argues that this conclusion is irrelevant to the facts giving rise to Widespread's causes of action and that it is not a proper subject for expert testimony. Widespread argues that it provides evidence of Upstate Breaker's copying.

To succeed on a claim for copyright infringement, Widespread must show factual copying. *See Batiste*, 976 F.3d at 502. Factual copying "may be inferred from proof of access to the copyrighted work and probative similarity." *Eng'g Dynamics, Inc.*, 26 F.3d at 1340 (quotation omitted). "A plaintiff can show probative similarity by pointing to 'any similarities between the two works,' even as to unprotectable elements, 'that, in the normal course of events, would not be expected to arise

independently.'" *Batiste*, 976 F.3d at 502 (quoting *Positive Black Talk Inc. v. Cash Money Recs., Inc.*, 394 F.3d 357, 370 & n.9 (5th Cir. 2004)).

Kent's fourth conclusion is relevant to copying because it tends to make it more probable that Buymybreaker.com, which was very different from UpstateBreaker.com but very similar to Widespread's Web site, arose not independently but from copying. *See Hall*, 2022 WL 2990912, at \*4 ("Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has 'any tendency to make a fact more or less probable than it would be without evidence' and 'is of consequence in determining the action.'"). And "expert testimony relating to the points of similarity … would provide context" and "would be helpful to the jury." *Rally Concepts, LLC*, 2006 WL 6889674 at \*2. And so the Court will not exclude this conclusion and the testimony relating to it.

### ii.    Conclusion 3 is a proper subject for expert testimony.

Kent's third conclusion is that "Plaintiff's site has included notifications proscribing the scraping of data from the site at least as early as June 2015." Upstate Breaker argues that this is not a proper subject for expert testimony because the notices would be obvious to any lay juror. Widespread argues that Kent goes beyond common understanding by explaining that the notifications were embedded in the Web page template and thus coded in nearly every page of the Web site, and that the conclusion is relevant to its breach of contract claim.

"A witness who is qualified as an expert … may testify in the form of opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Kent's specialized knowledge would help the jury understand, for example, what a web page template is or what it means for information to be coded into a page of a Web site. This would help the jury to understand the anti-scraping notification evidence. It would also help the jury determine facts in issue for the breach of contract claim.

And so the Court will not exclude this conclusion and the testimony relating to it.

### iii.    Conclusion 5 is reliable.

Kent's fifth conclusion is that "Defendant clearly benefited from the use of the scraped data, as can be seen from the revenue report showing the company suddenly selling products after the launch, with revenues reaching $139,555 in the month of November of 2021."

Upstate Breaker argues that it is too great an analytical leap to say that its profits are attributable to its alleged infringement because Kent gives no analysis to reach this conclusion. Widespread asserts that Kent did give his methodology, arguing that

> Mr. Kent outlines the facts and data on which he relies and the principles and methodology underlying his conclusion. As a baseline, Mr. Kent considered Upstate Breaker's original six-page website with no catalog or revenue. (App. 22). Mr. Kent examined Upstate Breaker's newly-created website, BuyMyBreaker.com, with hundreds of thousands of product pages using the information Upstate Breaker scraped from Widespread's website. (App. 35–38). As Mr. Kent notes, Upstate Breaker's new website now uses the information Upstate Breaker scraped to be better optimized for search engines such as

> Google, meaning BuyMyBreaker.com appears higher on search engine result pages in response to customer queries. (*Id.*). Mr. Kent explains that by scraping all of Widespread's product pages and using them as their own, Upstate Breaker capitalized on the search engine optimization built into those webpages by Widespread. (App. 38). Ultimately, Mr. Kent concluded that Upstate Breaker has "more products, matching more searches, [which] means the site will get more visits and thus more sales." (App. 35). Therefore, "[t]he reason the revenues increased is because they launched a web site with a lot of product pages." (App. 81–82 at 52:9–53:5).

Dkt. No. 99 at 14-15.

An opinion is reliable if it "is based on sufficient facts or data;" it is the "product of reliable principles and methods;" and "the expert has reliably applied the principles and methods to the facts of the case." *Ramos*, 2022 WL 615023, at *1

Kent's explanation of how Upstate Breaker benefitted from its alleged scraping clearly outlines the facts on which he relied, the basis for his opinion, and how he reached his conclusion. And so his opinion is reliable.

Upstate Breaker's arguments that the basis for Kent's opinion is too speculative go to the weight of Kent's opinion. Generally, an opposing party's "doubts about the bases for [an expert's] opinions do not render his opinions so unsupported as to create 'too great an analytical gap' between the evidence he relies on and his opinions." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). Cross-examination is the proper forum for attacking the bases of this conclusion.

And so the Court will not exclude this conclusion and the testimony relating to it.

### B.     The Sowards Expert Testimony

Widespread proffers the expert testimony of Sowards as a damages expert.

Under 17 U.S.C. § 504(a), a copyright owner can recover their actual damages and any additional profits of the infringer. Section 504(b) sets out that

> [t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

"However, a copyright owner must do more than simply provide the infringer's total gross revenue from all its profit streams or commercial endeavors." *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4065465 at *4 (S.D. Tex. Oct. 9, 2010) (citing *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 367 (5th Cir. 2010); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 511 (4th Cir. 2002)). "Rather, 'gross revenue' refers only to revenue *reasonably related* to the infringement." *MGE UPS Sys.*, 622 F.3d at 367 (quoting *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir.2005), emphasis in original). To be reasonably related, "the copyright owner must demonstrate 'some causal link between the infringement and the particular profit stream.'" *Interplan Architects*, 2010 WL 4065465 at *4 (quoting *Bonner*, 404 F.3d at 294). If the infringer's profits are only speculatively attributable to the infringement, the court will deny recovery.

*See id.* (citing *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004)).

Sowards's report calculates the "applicable revenue subject to an Accounting of Profits under Statute 17 USC 504." Dkt. No. 95 at 63. This applicable revenue, the report claims, is the gross revenue that Upstate Breaker reported from August 2019 to December 22, 2021, because "Defendant has represented that the above-shown Gross Revenue was earned by Buymybreaker.com, which is the Web site used by Defendant that was populated with the alleged copyright information of Plaintiff." *Id.*

This analysis, simple as it may be, establishes a causal link between the alleged infringing activity and the gross revenue to which Sowards points.

Upstate Breaker argues that there is no "analysis to support [Sowards's] conclusion that the amount of Upstate Breaker's gross revenue from August 2019 to December 2021 is attributable to the alleged infringement". Dkt. No. 88 at 13. But, consistent with Section 504(b), starting from the premise that Upstate Breaker infringed Widespread's copyright by scraping the data from their website, Sowards's analysis does not fail the reliability prong where he assumes that the Buymybreaker.com website was made up of infringing data and that Upstate Breaker's revenue from that website therefore came from the infringing data and is attributable to the infringing activity. *See ENGlobal U.S. Inc.,* 2018 WL 1877015, at *8 ("[e]xperts are permitted to assume the fact of liability and opine about the extent of damages").

-36-

Sowards and Widespread explain that they asked for more specific gross revenue numbers, and Upstate Breaker reports that it has answered Widespread's June 2022 interrogatory regarding revenue by part number. But, while that may or may not implicate a supplementation obligation under Federal Rules of Civil Procedure 26(a) and 26(e), it does not show that Sowards's testimony is unreliable to the point of exclusion under Rule 702.

The Court denies Upstate Breaker's request to exclude Sowards's expert testimony.

## Conclusion

The Court grants Widespread's Motion to Exclude the Expert Testimony of Ralph Oman [Dkt. No. 81] as to Oman's opinions applied to Widespread's copyright but denies it as to Oman's opinions on the history and development of the group registration copyright. And the Court grants Upstate Breaker's Motion to Disqualify Plaintiff's Designated Retained Experts [Dkt. No. 87] as to Kent's conclusion 1 but denies to it as to Kent's other four conclusions and as to Sowards's testimony.

SO ORDERED.

DATED: December 29, 2022

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE